UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------X
:
J.G., *individually and on behalf of R.G.*, D.G., :
*individually and on behalf of R.G.*, :
:
Plaintiffs, :
:
-v- :
:
BREWSTER CENTRAL SCHOOL DISTRICT,:
:
Defendant. :
:
--------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: ___2/7/2018___

15-CV-3612 (VSB)

**OPINION & ORDER**

Appearances:

Geraldine A. McMahon
The Law Offices of Gerry McMahon, LLC
Scarsdale, New York
*Counsel for Plaintiffs*

James P. Drohan
David Hannum Strong
Thomas, Drohan, Waxman, Petigrow & Mayle, LLP
Hopewell Junction, New York
*Counsel for Defendant*

VERNON S. BRODERICK, United States District Judge:

Plaintiffs J.G. (the "Father") and D.G. (the "Mother" and collectively, the "Parents"),

individually and on behalf of their son, R.G. (the "Student"), filed a complaint against Brewster

Central School District (the "District") pursuant to the Individuals with Disabilities Education

Improvement Act, 20 U.S.C. § 1400, *et seq*. ("IDEA"). The Parents seek review of a decision by

a New York State Department of Education State Review Officer ("SRO"), which affirmed the

denial of the Parents' request for tuition reimbursement for R.G.'s tuition at the Eagle Hill

School for the 2012-2013 and 2013-2014 school years. The District and the Parents each move

for summary judgment.  Because I find that the SRO's decision is thorough, careful, and well-reasoned, the Parents' motion, (Doc. 21), is DENIED; the District's motion, (Doc. 19), is GRANTED; and the SRO's decision is AFFIRMED.

## I.   Statutory and Procedural Framework

### A.   *Statutory Framework*

Congress enacted the IDEA "to ensure that all children with disabilities have available to them a free appropriate public education . . . designed to meet their unique needs . . . [and] to ensure that the rights of children with disabilities and parents of such children are protected."  20 U.S.C. § 1400(d)(1)(A)–(B).  States receiving public funds under the IDEA are required to provide a "free appropriate public education" ("FAPE") to "all children with disabilities."  *Id.* § 1412(a)(1)(A); *see Bd. of Educ. v. Rowley*, 458 U.S. 176, 180–81 (1982).  "A FAPE consists of special education and related services tailored to meet the unique needs of a particular child, which are reasonably calculated to enable the child to receive educational benefits, and provided in conformity with an individualized education program, or IEP."  *Hardison v. Bd. of Educ. of the Oneonta City Sch. Dist.*, 773 F.3d 372, 376 (2d Cir. 2014) (quoting *Reyes ex rel. R.P. v. N.Y.C. Dep't of Educ.*, 760 F.3d 211, 214 (2d Cir. 2014)).  Under the IDEA, school districts are required to "prepare an IEP for disabled students annually, and those IEPs 'must include the child's present levels of academic achievement and functional performance, goals and objectives for the child, and the special education and related services to be provided to the child so that he or she can advance toward attaining those goals and objectives."  *Id.*; *see also Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 107 (2d Cir. 2007) (noting that education and related services "must be administered according to an IEP, which school districts must implement annually" (citing 20 U.S.C. § 1414(d)); *Honig v. Doe*, 484 U.S. 305, 311 (1988) (explaining the

IEP as a "centerpiece" of the IDEA); *Frank G. v. Bd. of Educ.*, 459 F.3d 356, 363 (2d Cir. 2006) (describing the IEP as "[t]he key element of the IDEA"). The IEP must be reviewed at least annually and revised in accordance with the child's needs. 20 U.S.C. § 1414(d)(4). It is accomplished through collaboration with the parents of the child, educators, and specialists. *See M.O. v. N.Y.C. Dep't of Educ.*, 793 F.3d 236, 239 (2d Cir. 2015).

In New York, there are regulations in place to implement the IDEA, which "appear to track the IDEA closely." *Frank G.*, 459 F.3d at 363; *see also* N.Y. Comp. Codes R. & Regs. tit. 8, § 200.1 *et seq.* New York law tasks the creation of IEPs on Committees on Special Education ("CSEs"), comprised of members appointed by the board of education or trustees of the school district. *See Walczak v. Fla. Union Free Sch. Dist.*, 142 F.3d 119, 123 (2d Cir. 1998) (citing N.Y. Educ. Law § 4402(1)(b)(1)). CSEs "must include the student's parent(s), a regular or special education teacher, a school board representative, a parent representative, and others." *R.E. v. N.Y.C. Dep't of Educ.*, 694 F.3d 167, 175 (2d Cir. 2012) (citing N.Y. Educ. Law § 4402(1)(b)(1)(a)). "In developing a particular child's IEP, a Committee on Special Education is required to consider four factors: (1) academic achievement and learning characteristics, (2) social development, (3) physical development, and (4) managerial or behavioral needs." *Frank G.*, 459 F.3d at 363 (quoting *Walczak*, 142 F.3d at 123).

If parents disagree with a CSE's determination and believe that the State is not providing a FAPE to their child, "they may, at their own financial risk, enroll the child in a private school and seek retroactive reimbursement for the cost of the private school from the state." *Gagliardo*, 489 F.3d at 111. To seek such tuition reimbursement, a parent must first file a due process complaint with the Department of Education; the due process complaint initiates administrative proceedings involving an impartial due process hearing before an Impartial Hearing Officer

("IHO").  *See M.W. ex rel S.W. v. N.Y.C. Dep't of Educ.*, 725 F.3d 131, 135 (2d Cir. 2013) (citing 20 U.S.C. § 1415(b)(6), (f); N.Y. Educ. Law § 4404(1)).  "An IHO's decision may, in turn, be appealed to a State Review Officer ("SRO"), who is an officer of the State's Department of Education."  *M.H. v. N.Y.C. Dep't of Educ.*, 685 F.3d 217, 225 (2d Cir. 2012) (citing *Grim v. Rhinebeck Cent. Sch. Dist.*, 346 F.3d 377, 379–80 (2d Cir. 2003)); *see also* N.Y. Educ. Law § 4404(2).  Any party who wishes to challenge the SRO's final administrative decision has the right to seek review of it by bringing a civil action in federal court.  *See M.W.*, 725 F.3d at 135–36; 20 U.S.C. § 1415(i)(2)(A); N.Y. Educ. Law § 4404(3)(a).  On a federal appeal, the district court receives "the records of the administrative proceedings" and, if requested, hears additional evidence.  20 U.S.C. § 1415(i)(2)(C).  The district court then "grant[s] such relief as the court determines is appropriate," based on the preponderance of the evidence.  *Id.*

## B.  *Federal District Court Review of State Educational Decisions*

A motion for summary judgment in the IDEA context is not an ordinary summary judgment motion; it "functions as an appeal from an administrative decision."  *C.W.L. & E.L. v. Pelham Union Free Sch. Dist.*, 149 F. Supp. 3d 451, 461 (S.D.N.Y. 2015).  Thus, the existence of a genuinely disputed issue of fact in an IDEA case will not necessarily defeat a motion for summary judgment.  *See G.B. ex rel. N.B. v. Tuxedo Union Free Sch. Dist.*, 751 F. Supp. 2d 552, 570 (S.D.N.Y. 2010).

In such an action, the Court (1) reviews the record of the administrative proceedings; (2) hears additional evidence at the request of a party; and (3) grants such relief as it deems appropriate based on the preponderance of the evidence.  20 U.S.C. § 1415(i)(2)(C); *see also Grim*, 346 F.3d at 380.  This standard of review has been characterized as "modified de novo."  *E.S. ex rel. B.S. v. Katonah-Lewisboro Sch. Dist.*, 742 F. Supp. 2d 417, 424 (S.D.N.Y. 2010).

While the court must engage in an independent review of the record and make the preponderance of the evidence determination, review of the state administrative decisions is limited.  *See Rowley*, 458 U.S. at 205–06; *M.P. v. Carmel Cent. Sch. Dist.*, No. 15 CV 3432 (VB), 2016 WL 379765, at *3 (S.D.N.Y. Jan. 29, 2016).

Moreover, the IDEA requires "substantial deference to state administrative bodies on matters of educational policy."  *Cerra v. Pawling Cent. Sch. Dist.*, 427 F.3d 186, 191 (2d Cir. 2005).  "[T]he judiciary generally lack[s] the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy."  *Walczak*, 142 F.3d at 129 (internal quotation marks omitted).  In that regard, the court will not "substitute [its] own notions of sound educational policy for those of the school authorities which [it] review[s]."  *Rowley*, 458 U.S. at 206.  Where the SRO's review has been "thorough and careful," deference is "particularly appropriate." *Walczak*, 142 F.3d at 129; *see also A.C. ex rel. M.C. v. Chappaqua Cent. Sch. Dist.*, 553 F.3d 165, 171 (2d Cir. 2009).  Consequently, "[c]ourts generally 'defer to the final decision of the state authorities, even where the reviewing authority disagrees with the hearing officer.'"  *M.H.*, 685 F.3d at 241 (quoting *A.C.*, 553 F.3d at 171).  However, such deference is not absolute, since the deference owed to an SRO's decision hinges on the quality of that opinion.  Reviewing courts must look to the factors that "normally determine whether any particular judgment is persuasive, for example, whether the decision being reviewed is well-reasoned, and whether it was based on substantially greater familiarity with the evidence and the witnesses than the reviewing court."  *Id*. at 244.

## II.    **Factual Background**

The following undisputed facts are taken from the parties' joint statement of facts and the administrative record.  R.G. is 14 years old.  (JSOF ¶ 1.)[1]  Since first grade, R.G. has been classified as a student with learning disabilities under the IDEA.  (*Id.* ¶ 4.)  He attended public school in the Brewster Central School District in Putnam County, New York, through the 2011-2012 school year, his fifth grade year.  (*Id.* ¶ 2.)  For the 2012-2013 and 2013-2014 school years, his sixth and seventh grade years, the Parents unilaterally placed R.G. at Eagle Hill School, a private school located in Greenwich, Connecticut.  (*Id.* ¶ 3.)

### A.    *R.G.'s Educational History Prior to the 2011 IEP*

R.G. did well during his first and second grade years, pursuant to the IEPs that were created for him for those years.  (R. 272, 278.)[2]  He began having difficulties in third grade when the academics became more difficult for him, and he realized that he was in special education.  (R. 280–82; Ex. 99.)[3]  He no longer wanted to read.  (R. 296.)  In R.G.'s third grade year, he received the following academic test results:

- Below benchmark on the Dynamic Indicators of Basic Early Learning Skills ("DIBELS") Oral Reading Fluency and Retell Fluency, (Ex. 97, at 3, 4);
- On the NYSTP, grades of 637 in English Language Arts (proficiency being 662 or higher), (Ex. 33, at 1), and 662 in Mathematics (proficiency being 684), (Ex. 34, at 1);
- Two years below age appropriate on Bender-Gestalt Test of Visual Motor Integration, (Ex. 42, at 4).

He did not achieve any of his IEP goals for Mathematics or Motor Skills, (Ex. 26, at 3–4), and did not achieve all of his IEP Reading goals, (Ex. 26, at 2–3).

---

[1] "JSOF" refers to the parties' Joint Statement of Facts and Parties' Allegations.  (Doc. 18.)

[2] "R." refers to the transcript of the hearing before the IHO held on March 5, 2014, March 17, 2014, April 23, 2014, June 9, 2014, and September 3, 2014, which was filed under seal.

[3] As cited in the JSOF, the District's exhibits from the underlying administrative proceeding are identified by letter (*e.g.*, "Ex. A") and the Parent's exhibits are identified by number (*e.g.*, "Ex. 1").

In R.G.'s fourth grade year, he received the following test results:

- On the NYSTP, grades of 658 in English Language Arts (proficiency being 671 or higher), (Ex. 37), and 669 in Mathematics (proficiency being 676), (Ex. 38);
- Over two years below age appropriate on Bender-Gestalt Test of Visual Motor Integration, (Ex. 106, at 3);
- On the AIMSweb testing, grades of 116 in reading curriculum ("below average—further assess and consider individualizing program"), 8 in MAZE comprehension ("well-below average—begin immediate problem solving"), 9 in mathematics ("well below or below average—begin immediate problem solving"), and 32 in math computation ("well below or below average—begin immediate problem solving"), (Ex. 40).

The district evaluator said that R.G. continued to struggle with "grade level curriculum in both reading decoding, and comprehension" and that he learned best "in small group settings where new concepts can be introduced in manageable chunks with numerous opportunities for practice and reinforcement." (Ex. 43, at 1.)

D.G., R.G.'s Mother, expressed concerns about R.G.'s workload, and ability to study for tests, and requested information about extra support. (Ex. 103, at 1; Ex. 118, at 1.) D.G. met with R.G.'s teacher and requested study notes, as indicated in his IEP. (R. 317–18.) The teacher gave unredacted notes from a peer who had repeatedly bullied R.G. over the course of the year. (R. 318–25.) D.G. emailed the teacher about the incident, but the teacher ignored D.G.'s concern. (Ex. 103, at 1.) After the incident with the bully's notes, R.G. told D.G. that he wanted to kill himself, (R. 318), and D.G. asked the District Special Education Teacher if R.G. could see a counselor, (Ex. 118, at 4.) The teacher said that the social worker was on medical leave for the remainder of the school year, and that they may wish to add counseling to R.G.'s IEP for the following school year. (Ex. 118, at 4.)

**B.** *The 2011 IEP*

On May 26, 2011, the CSE convened to develop an IEP for R.G.'s 2011-2012 school year. (JSOF ¶ 10; Ex. 16.) The following summarizes the IEP that was developed at the May

26, 2011 CSE meeting for R.G.:

- Integrated Co-Teaching Services (English / Language Arts Class);
- Integrated Co-Teaching Services (Math Class);
- Integrated Co-Teaching Services (Science Class); and
- Integrated Co-Teaching Services (Social Studies Class).

(JSOF ¶ 11; Ex. 16, at 8–9.)  The IEP also recommended the following related services once per week:

- Psychological Counseling Services (individual); and
- Occupational Therapy (small group).

(JSOF ¶ 11; Ex. 16, at 8–9.)

In May, June, and July of 2011, R.G.'s parents arranged for private testing.  (JSOF ¶ 6.) The private evaluators diagnosed R.G. with (1) mixed receptive-expressive language disorder; and (2) developmental coordination disorder.  (*Id.* ¶ 7.)  A private psychological evaluation reported that R.G. had an IQ of 83, and estimated that his overall cognitive function was in the low-average range.  (*Id.* ¶ 8.)  The private speech and language evaluation reported that R.G. had depressed receptive and expressive language skills, (*id.* ¶ 9), and recommended the following:

- R.G. should remain in an integrated co-teaching class;
- R.G. should continue to receive occupational therapy; and
- R.G. should receive testing accommodations consisting of extended time on tests; a quiet, separate location for testing; note-taker/scribe to help him copy assignments; and directions to read and reread, and check for understanding.

(Ex. 46, at 4.)

C.    *The 2011-2012 School Year (Fifth Grade)*

R.G.'s 2011-2012 integrated co-teaching class was made up of approximately 25 to 27 students, seven to twelve of whom were classified students.  (JSOF ¶ 12; R. 164–65.)  R.G. received the following test results during his fifth grade year:

- On the NYSTP, grades of 638 in English Language Arts (proficiency is 668 or higher), (Ex. 37, at 1), and 647 in Mathematics (proficiency is 676 or higher), (Ex. 38, at 1);

- On the AIMSweb testing in September, January, and May of that school year, grades of 93, 103, and 112 in reading curriculum ("Below Average"; "Further Assess and Consider Individualizing Program"), grades of 10, 24, and 19 in MAZE comprehension ("Average"; "Continue Current Program"), grades of 1 and 7 in math concepts and applications[4] ("Well Below Average"; "Begin Immediate Problem Solving"), and grades of 4, 11, and 20 in math computation ("Well Below Average"; "Begin Immediate Problem Solving"), (Ex. 18, at 4–5; Ex. 41, at 1–2).

R.G.'s fifth grade report card reflected passing final grades in all subjects (Reading: 85; Writing: 80; Mathematics: 88; Science: 100; Social Studies: 98). (Ex. P, at 4.) R.G. had achieved thirteen of his eighteen IEP goals in the areas of study skills, reading, writing, and math, and was progressing on the remaining five. (Ex. 32, at 2–5.)

R.G.'s fifth grade special education teacher said that by the end of the 2011-2012 school year, he was on grade level with reading comprehension, and just below grade level in reading fluency. (R. 163, 178.) She testified that he had friends, participated in class, and exhibited no behavior issues. (R. 175–76.) R.G.'s Speech and Language Pathologist said that R.G.'s speech/language deficits had "accumulated from not having those skills when [he needs] to use those skills to learn what's being presented to [him]." (R. 563; Ex. 45, at 1.) R.G.'s fifth grade teacher said he was reading at a "beginning of the fourth grade level." (Ex. 110, at 1.) The District social worker testified that R.G. coped well with fifth grade, had friends, and demonstrated no socialization issues. (R. 91–92.) He also testified that R.G. was not exhibiting the same level of frustration with academics as he had in fourth grade, and it was not necessary to continue the IEP goal of identifying and dealing with frustration. (R. 105–06; Ex. 32, at 5.)

At the June 8, 2012 annual review meeting, R.G.'s parent said that R.G.'s fifth grade year was better and that his confidence and social aspects had improved. (Ex. 18, at 2.) At the

---

[4] There is no test score for math concepts and applications in January of 2012.

hearing, R.G.'s mother testified that those comments were accurate when she made them. (R. 423–24.) She further testified that fifth grade was in fact better than fourth grade for R.G. both socially and emotionally. (R. 455.)

**D.** *The 2012 IEP*

On June 8, 2012, the CSE convened to develop R.G.'s IEP for the 2012-2013 school year. (JSOF ¶ 13; Ex. 18.) The following summarizes the IEP that was initially developed for R.G.'s 2012-2013 school year:

- Consultant Teacher Services (Direct) (Integrated Co-Teaching Support Lab);
- Integrated Co-Teaching Services (English / Language Arts Class);
- Integrated Co-Teaching Services (Math Class);
- Integrated Co-Teaching Services (Science Class);
- Integrated Co-Teaching Services (Social Studies Class); and
- Consultant Teacher Services (Indirect).

It also recommended the following related services:

- Psychological Counseling Services (individual);
- Occupational Therapy (small group).

(JSOF ¶ 14; Ex. 18, at 9–10.) This added direct (every other day) and indirect (twice monthly) consultant teacher services and increased the number of small group occupational therapy sessions from one to two times weekly. (Ex. 18, at 9–11.)

In June 2012, the Parents provided the CSE with the private evaluations performed the prior summer. (*Id.* at 1.) After receiving the results of the private evaluations, the District recommended a new speech-language evaluation be performed because the Parents' private evaluation was almost a year old. (Ex. 18, at 2.)

By letter dated July 18, 2012, the Parents advised the District that they would be enrolling R.G. in Eagle Hill School for the 2012-2013 school year and intended to seek tuition reimbursement from the District. (JSOF ¶ 15.)

On August 8, 2012, the CSE reconvened for a program review. (*Id.* ¶ 16.) The new speech and language evaluation was conducted on August 15, 2012. (Ex. 50.) It reconvened again on August 28, 2012 for another program review. (JSOF ¶ 17.) Based on the test results, the District recommended that R.G. receive small group speech and language therapy, one time weekly in the classroom, and one time weekly in the therapy room. (Ex. 50, at 5; Ex. 21, at 10.)

**E.      *The 2012-2013 School Year at Eagle Hill (Sixth Grade)***

R.G. attended Eagle Hill School for the 2012-2013 school year. (JSOF ¶ 18.) Eagle Hill students do not receive numerical course grades. (R. 651.) However, R.G. received the following test evaluations in December 2012:

- Writing and spelling skills in average range, and phonological skills and reading fluency in average range, (Ex. 46, at 2);
- Average performance with reading and writing, and average performance with mathematics, (Ex. 51, at 4);
- Average range on all eleven of the subtests administered as part of the Wechsler Individual Achievement Test III, (*id.* at 6);
- Average range on a supplemental subtest administered in the area of essay composition, and in the high average range in area of oral reading rate (*id.* at 7).

**F.      *The 2013 IEP***

The CSE reconvened on May 22, 2013 to develop a program for R.G. for the 2013-2014 school year. (JSOF ¶ 19; Ex. 22.) The District's school psychologist reviewed R.G.'s December 2012 psychoeducational evaluation and March 2013 observation. She advised that the testing indicated that R.G. had low average overall cognitive ability, working memory as a relative strength, and average academic achievement skills, with a relative strength in reading comprehension and fluency. (R. 57–58; Ex. 22, at 2.) The CSE also reviewed an updated occupational therapy evaluation, which demonstrated that R.G. had neat and legible writing skills, and good organizational and academic functional skills throughout, and determined that continuation of occupational therapy for 2013-2014 was not recommended. (Ex. 22, at 2;

Ex. 52.)  The following summarizes the IEP that was developed at the meeting:

- Special Class (Academic Support Lab), 15:1;
- Integrated Co-Teaching Services (English / Language Arts Class);
- Integrated Co-Teaching Services (Math Class);
- Integrated Co-Teaching Services (Science Class); and
- Integrated Co-Teaching Services (Social Studies Class).

It also recommended the following related services:

- Speech/Language Therapy (small group) (Classroom);
- Speech/Language Therapy (small group) (Therapy Room); and
- Psychological Counseling Services (individual).

(JSOF ¶ 20; Ex. 22.)  This program removed direct and indirect consultant teacher services and added a special class (academic support lab) every other day.  (Ex. 22.)

By letter dated August 16, 2013, the Parents advised that the District that they would be re-enrolling R.G. in Eagle Hill School for the 2013-2014 school year, and intended to seek tuition reimbursement form the District.  (JSOF ¶ 21.)  The CSE reconvened on September 13, 2013 to review the Parents' concerns about the program.  (*Id.* ¶ 22; Ex. A.)  The District school psychologist reviewed his December 2012 testing again, and the District's special education teacher described the supports available to R.G. for English Language Arts and Math.  (Ex. A, at 2.)

R.G. attended Eagle Hill School for the 2013-2014 school year.  (JSOF ¶ 23.)

G.    *The IHO Decision*

The Parents filed a due process complaint with the District dated December 11, 2013 (the "Due Process Complaint").  (JSOF ¶ 24.)  They alleged that the District failed to provide a FAPE for the 2012-2013 school year and failed to offer a FAPE for the 2013-2014 school year.  (Ex. 67, at 9–10.)  An impartial hearing was conducted over six days:  March 5, 2014, March 17, 2014, April 23, 2014, June 9, 2014, and September 3, 2014.  (JSOF ¶ 25.)  The IHO issued her

Findings of Fact and Decision on November 3, 2014, finding in favor of the District and dismissing the Due Process Complaint. (*Id.* ¶ 27.)

In that decision, the IHO considered the 2011-2012 school year as relevant to the question of the appropriateness of the IEPs for the 2012-2013 and 2013-2014, and made the following findings as to the 2011-2012 year: (1) R.G.'s fifth grade year (2011-2012), by the Parents' own admission, was better than his fourth grade year (2010-2011); (2) the May 2011 IEP was consistent with the private evaluators' recommendations, with the exception of speech language therapy recommendation; (3) R.G. had friends, liked fifth grade, and did not experience the same frustrations that he did in fourth grade, according to R.G.'s fifth grade counselor; and (4) R.G. had friends, participated in class, achieved many of IEP goals, and made overall academic progress, including in reading, according to R.G.'s fifth grade special education teacher. (IHO Decision 16–17.)[5] The IHO concluded that R.G. had been provided a FAPE for the 2011-2012 school year. (*Id.* at 17.)

The IHO made the following findings and/or recommendations as to the 2012-2013 school year: (1) the recommendation to keep R.G. in integrated co-teaching classes was appropriate because R.G. had demonstrated ability to progress in that setting during the prior year; (2) the Parents' private evaluations supported the District's IEP because the private evaluations recommended R.G. continue with integrated co-teaching classes and the IEP recommended speech language therapy (albeit after an updated speech language evaluation was conducted and after the Parents notified the District of their intent to place R.G. at Eagle Hill; (3) the psychological testing during the 2012-2013 was consistent with prior testing, showing that

---

[5] "IHO Decision" refers to the November 3, 2014 Findings of Fact and Decision of Impartial Hearing Officer (IHO) Jeanne M. Keefe in the sealed administrative record.

R.G. had low average cognitive skills and average achievement skills; and (4) the Eagle Hill tests performed in the fall of 2012 showed that R.G. had left the District with abilities in the average range and that R.G. had entered Eagle Hill with age appropriate skills. (*Id.* at 17–18.) The IHO made the following findings as to the 2013-2014 school year: (1) the Parents did not present updated cognitive or achievement testing suggesting R.G.'s functioning had changed; and (2) information available to the CSE supported continuation of R.G.'s placement in integrated co-teaching classes. (*Id.* at 18.) The IHO concluded that the District provided a procedurally and substantively sound IEP for the 2012-2013 and 2013-2014 school years, thereby providing R.G. with a FAPE. (*Id.*)

#### H. *The SRO Decision*

The Parents appealed the IHO's decision to the Office of State Review by petition dated December 12, 2014. (JSOF ¶ 28.) On or about January 8, 2015, the SRO issued a decision, finding in favor of the District and dismissing the Parents' appeal. (*Id.* ¶¶ 29–30.) The SRO agreed that R.G.'s progress under the 2011 IEP was relevant for assessing appropriateness of the IEPs for 2012 and 2013. (SRO Decision 5–6.)[6] The SRO found that, contrary to the Parents' argument, the IHO had correctly determined that R.G. made progress during the 2011-2012 school year, as evidenced by (1) the benchmark testing showing progress in all areas; (2) the June 2012 progress report showing that R.G. had achieved the majority of the goals set in his 2011 IEP; (3) the April 2012 counseling report showed R.G. handled situations well; (4) R.G.'s grades were in the 80s and 90s; and (5) the Parent's June 2012 statement that R.G. was improving socially and had higher confidence. (*Id.* at 6–7.) The SRO determined that, although

---

[6] "SRO Decision" refers to the January 8, 2015 Decision of State Review Officer (SRO) Justyn P. Bates in the sealed administrative record.

"the student's rate of progress during the 2011-12 school year does not provide a clear indicator of the appropriateness of the subsequent IEPs," the record supported the finding that R.G. had demonstrated meaningful progress commensurate with abilities during the 2011-2012 school year. (*Id.*)

The SRO also found that the evidence supported a finding that, based on the information before the CSE between May and August 2012, "a general education placement with [integrated co-teaching] services, along with the recommended related services, was appropriate." (*Id.* at 7.) "Integrated co-teaching services" are defined as the "provision of specially designed instruction and academic instruction provided to a group of students with disabilities and nondisabled students." N.Y. Comp. Codes R. & Regs. tit. 8 § 200.6(g). It also found that the hearing record shows that the 2012 CSE considered the Parents' private evaluation reports, and ultimately developed an IEP for the 2012-2013 school year that included the services recommended by the private evaluators. (SRO Decision 7.)

Further, the SRO determined that the May 2013 IEP reviewed the updated cognitive and achievement testing available, which did not suggest that R.G.'s "level of functioning and needs had changed significantly for the 2013-2014 school year, thus necessitating a placement other than a general education class placement with ICT and related services." (*Id.*) The SRO affirmed the IHO's conclusion that R.G. had been provided a FAPE for the 2012-2013 and 2013-2014 school years. (*Id.* at 7–8.) The SRO also concluded that because the Parents did not assert in their Due Process Complaint that the District had failed to offer a FAPE for the 2011-2012 school year, it was outside the scope of the hearing. (*Id.* at 8.)

### III.    **Procedural History**

Plaintiffs filed their complaint in this matter on May 8, 2015, seeking (1) reversal of the decision of the SRO denying reimbursement to them for their son's tuition costs at Eagle Hill School for the 2012-2013 and 2013-2014 school years; (2) a determination that they, by reason of their son's unique needs as a student with a learning disability, met the standard for full reimbursement relief related his tuition and placement at Eagle Hill School for the 2012-2013 and 2013-2014 school years; (3) a determination that the Brewster Central School District failed to provide their son with a free and appropriate public education for the 2011-2012 school year and an award of compensatory education for this violation; and (4) leave to file a fee application pursuant to the fee-shifting provisions of the IDEA.  (Doc. 1 ("Fed. Compl.").)  Defendant answered on June 30, 2015.  (Doc. 5.)

On February 19, 2016, Defendant filed its motion for summary judgment, (Doc. 19), and memorandum of law in support of its motion, (Doc. 20).  On April 1, 2016, Plaintiffs filed their motion for summary judgment, (Doc. 21), memorandum of law in support of their motion, (Doc. 22), and opposition to Defendant's motion for summary judgment, (Doc. 23).  On April 22, 2016, Defendant filed its opposition to Plaintiffs' motion for summary judgment.  (Doc. 24.)  On May 13, 2016, Plaintiffs filed their reply in further support of their motion for summary judgment.  (Doc. 25.)

On June 6, 2016, I granted Plaintiffs' motion to submit additional evidence beyond what was admitted in the record before the SRO.  Specifically, I allowed Plaintiffs to submit copies of the December 2014 EHS Progress Report, the February 2015 EHS Report Card, and the June 2015 EHS Progress Report. (Doc. 26.)  The parties also filed supplemental briefing regarding the additional evidence submitted by Plaintiffs.  (Docs. 29–30.)

## IV. Discussion

The Parents make the following arguments: (1) the IHO and SRO ignored R.G.'s regression in the years leading up to the 2011-2012 school year; (2) the IHO and SRO erred in concluding that the District provided a FAPE for the 2011-2012 school year and offered a FAPE for the 2012-2013 and 2013-2014 school years; (3) the issue of whether R.G. was likely to make progress or regress is not a purely educational issue that warrants deference; (4) the SRO's finding that R.G. progressed in 2011-2012 should be overturned as unsubstantiated; (5) the SRO's finding that the 2012-2013 program was appropriate should be overturned; and (6) the SRO's finding that the 2013-2014 program was appropriate should be overturned. (Pls.' Br. 6–14.)[7] They also argue that the IHO erred in finding the EHS offered an inappropriate program and the equitable considerations warrant denial of tuition reimbursement, because the Parents presented sufficient evidence that EHS offered an appropriate program for R.G., and equitable considerations support the Parents' request for tuition reimbursement and related expenses. (*Id.* at 15–23.)

### A. *Applicable Law*

In determining whether parents are entitled to tuition reimbursement, the Supreme Court has established the three-prong *Burlington-Carter* test, which looks to "(1) whether the school district's proposed plan will provide the child with a free appropriate public education; (2) whether the parents' private placement is appropriate to the child's needs; and (3) a consideration of the equities."[8] *C.F. ex rel. R.F. v. N.Y.C. Dep't of Educ.*, 746 F.3d 68, 73 (2d Cir. 2014). The

---

[7] "Pls.' Br." refers to Memorandum of Law in Support of Plaintiffs' Cross-Motion for Summary Judgment. (Doc. 22.)

[8] The Second Circuit recently characterized the first two *Burlington* factors as a three-step determination: (1) "whether the school district has complied with the IDEA's procedural requirements," (2) "whether the IEP is reasonably calculated to enable the child to receive educational benefits," and (3) the "whether the private schooling obtained by the parents is appropriate to the child's needs." *Doe v. E. Lyme Bd. of Educ.*, 790 F.3d 440, 448–49 (2d

school district bears the burden of proof on the first and third prongs of the *Burlington/Carter* test.  N.Y. Educ. Law § 4404(1)(c).[9]

The first element—whether the IEP complies with FAPE—has two components.  *C.F. ex rel R.F.*, 746 F.3d at 78–79.  "At the first step, courts examine whether there were procedural violations of the IDEA, namely, whether the state has complied with the procedures set forth in the IDEA.  Procedural violations only entitle parents to reimbursement if they impeded the child's right to a free appropriate public education, significantly impeded the parents' opportunity to participate in the decisionmaking process, or caused a deprivation of educational benefits."  *Id.* (quoting 20 U.S.C. § 1415(f)(3)(E)(ii)) (internal quotation marks omitted).[10]  "Second, courts examine whether the IEP was substantively adequate, namely, whether it was reasonably calculated to enable the child to receive educational benefits.  Substantive inadequacy automatically entitles the parents to reimbursement."  *Id.* at 79 (quoting *R.E.*, 694 F.3d at 190); *T.M. ex rel. A.M. v. Cornwall Cent. Sch. Dist.*, 752 F.3d 145, 160 (2d Cir. 2014) ("Substantive inadequacy automatically entitles the parents to reimbursement, as long as the parents' alternative placement was appropriate and equitable considerations favor reimbursement." (internal quotation marks omitted)).

In order to be substantively adequate, the IEP must be "reasonably calculated to enable

---

Cir. 2015).  If the parent has met all three requirements, "[e]quitable considerations are relevant" in affording relief.  *Id.*  The court noted, however, that this was a difference of "enumeration, not of substance."  *Id.* at 448 n.6.

[9] N.Y. Educ. Law § 4404(1)(c) states:

> The board of education or trustees of the school district or the state agency responsible for providing education to students with disabilities shall have the burden of proof, including the burden of persuasion and burden of production, in any such impartial hearing, except that a parent or person in parental relation seeking tuition reimbursement for a unilateral parental placement shall have the burden of persuasion and burden of production on the appropriateness of such placement.

[10] The IHO concluded that the Parents did not allege any procedural violations in the Due Process Complaint, and that finding was not appealed to the SRO.  The Parents do not allege any procedural violations here.

the child to receive educational benefits." *Rowley*, 458 U.S. at 207. "[A] school district fulfills its substantive obligations under the IDEA if it provides an IEP that is 'likely to produce progress, not regression,' and if the IEP affords the student with an opportunity greater than mere 'trivial advancement.'" *Cerra*, 427 F.3d at 195 (quoting *Walczak*, 142 F.3d at 130). "A school district is not, however, required to furnish 'every special service necessary to maximize each handicapped child's potential.'" *Id.* (quoting *Rowley*, 458 U.S. at 199). "In order to avoid impermissibly meddling in state educational methodology, a district court must examine the record for any objective evidence indicating whether the child is likely to make progress or regress under the proposed plan." *Id.* (internal quotation marks omitted). While the IEP must guarantee an "appropriate" education, it need not "provide[] everything that might be thought desirable by loving parents." *Walczak*, 142 F.3d at 132 (internal quotation marks omitted). An "IEP must be evaluated *prospectively* as of the time of its drafting and therefore . . . retrospective testimony that the school district would have provided additional services beyond those listed in the IEP may not be considered in a *Burlington/Carter* proceeding." *R.E.*, 694 F.3d at 186 (emphasis added).

The IDEA also "expresses a strong preference" for educating disables students in their "least restrictive environment," meaning alongside their non-disabled peers. *See Walczak*, 142 F.3d at 122; 20 U.S.C. § 1412(a)(5)(A). However, "while mainstreaming is an important objective, . . . the presumption in favor of mainstreaming must be weighed against the importance of providing an appropriate education to handicapped students." *P. ex rel. Mr. & Mrs. P. v. Newington Bd. of Ed.*, 546 F.3d 111, 119 (2d Cir. 2008).

### B.    *Application*

### 1.  The 2011-2012 School Year

The Parents seek compensatory educational services—as opposed to tuition reimbursement—for the District's failure to provide a FAPE for the 2011-2012 school year. (Pls.' Br. 5.)  The SRO concluded that, because the Parents did not assert a denial of FAPE for the 2011-2012 year in their Due Process Complaint, the IHO correctly declined to review it. (SRO Decision 8.)

The Parents do not dispute that they did not allege a denial of FAPE for the 2011-2012 school year in their Due Process Complaint.  (*See* Fed. Compl. ¶ 39 ("[T]he Plaintiff-Appellants did not allege a denial of FAPE for the 2011-2012 school year in their original due process complaint . . . .").)  Instead, they argue that their failure to raise the issue in their Due Process Complaint should be waived because the District "opened the door when it raised the issue" during the hearing by presenting evidence regarding R.G.'s 2011-2012 school year.  (Pls.' Br. 6.) The evidence about the 2011-2012 school year was offered and discussed as background information in support of the IEP determinations for the subsequent years, not as a separate assertion about the appropriateness of the 2011-2012 IEP.  This did not "open the door" to a wholly separate claim as to the appropriateness of the 2011-2012 IEP.  *See C.W.L. & E.L.*, 149 F. Supp. 3d at 463–64 (concluding that school district did not open the door to appropriateness of education provided during school year not raised in parents' complaint where district offered testimony concerning that year in responding to parents' claims); *cf. M.H.*, 685 F.3d at 250 (district opened the door to appropriateness of methodology used to educate autistic student even though it was not raised parents' due process complaint where district raised it "first in its opening statement, and then in the questioning of its first witness").  Both parties discussed the

2011-2012 school year as relevant to the question of whether a FAPE was provided in 2012-2013 and 2013-2014. There is no indication that the District obtained a strategic advantage by discussing the 2011-2012 school year such that it would be unfair to the Parents to disallow them from pursuing the claim. Indeed, central to the Parents' argument is the extent to which the District properly considered R.G.'s purported regression in the years leading up to the 2011-2012 school year in determining program recommendations for the subsequent years. Accordingly, the Parents' are precluded from alleging that the District failed to provide a FAPE during the 2011-2012 school year because they failed to raise the issue below in their Due Process Complaint.

## 2. The 2012-2013 School Year

The Parents argue that the District failed to consider R.G.'s "complex educational profile" and his failure to make progress in the years leading up to the 2012-2013 school year by offering the "same, inappropriate program for the 2012-2013 school year." (Pls.' Br. 10.) The Parents specifically object to the District's decision to continue offering the Integrated Co-Teaching ("ICT") model for R.G.'s academic classes in light of his regression in third and fourth grades, and failure to provide necessary speech-language therapy. (*Id*. at 11, 12.) Contrary to the Parents' arguments, the IHO and SRO thoroughly considered R.G.'s progress and educational history during the year leading up to the 2012 IEP. The SRO concluded that the IHO had correctly determined that R.G. made progress during the 2011-2012 school year. (SRO Decision 6.) It noted that while R.G.'s "performance generally remained in the below average ranges, he demonstrated progress in all areas tested, including: reading words, reading comprehension, mathematics concepts and applications, and mathematics computation." (*Id*.) This conclusion is supported by the standardized test results and R.G.'s fifth grade reports, which

show that R.G. was making progress during the 2011-2012 school year. (*See* Ex. 18, at 4–5; Ex. 41, at 1–2.) It is also supported by the fact that R.G. earned all passing grades during the fifth grade as documented in R.G.'s report card, (Ex. P), and his successful achievement of thirteen of his eighteen IEP goals in the areas of study skills, reading, writing, and math, and his progression on the remaining five, (Ex. 32, at 2–5). Finally, these conclusions are also supported by the Parents' own admission that R.G. made improvement in the 2011-2012 school year. (Ex. 18, at 2; R. 423–24.) I therefore defer to the SRO's determination that, although R.G. was still below grade level abilities, the record demonstrated "meaningful progress during the 2011-12 school year commensurate with his abilities." (SRO Decision 7; *see also Cerra*, 427 F.3d at 195 ("Because administrative agencies have special expertise in making judgments concerning student progress, deference is particularly important when assessing an IEP's substantive adequacy."); *M.S. ex rel. S.S. v. Bd. of Educ. of the City Sch. Dist. of the City of Yonkers*, 231 F.3d 96, 105 (2d Cir. 2000) ("An assessment of educational progress is a type of judgment for which the district court should defer to the SRO's educational experience, particularly where, as was the case here, the district court's decision was based solely on the record that was before the SRO.").)

The Parents point to the fact that R.G.'s standardized test results declined from his fourth grade year to his fifth grade year, and that R.G. remained below grade-level in many respects. However, I defer to the SRO and IHO determinations that R.G.'s progress during fifth grade under an IEP that incorporated ICT services supported continuation of ICT services. In any event, even assuming R.G. regressed from fourth to fifth grade, any such regression should only receive limited weight because of the objective progress R.G. made, and the fact that 2012 CSE made material changes to the IEP that were designed to address R.G.'s difficulties.

(SRO Decision 6.)  The June 2012 IEP added direct (every other day) and indirect (twice monthly) consultant teacher services and reduced the frequency of the student's related services to one individual counseling session per month and two small group OT sessions per month. The August 28, 2012 IEP added two small group (5:1) speech-language therapy sessions per week to the student's program.  Thus, any regress sheds little light on the appropriateness of the changes the 2012 CSE made in response to that regress.

The SRO concluded that the information available to the June and August 2012 CSEs supported "a general education placement with ICT services, along with the recommended related services, was appropriate for the student."  (*Id.* at 7.)  ICT services are the "provision of specially designed instruction and academic instruction provided to a group of students with disabilities and nondisabled students."  N.Y. Comp. Codes R. & Regs. tit. 8, § 200.6(g).  The State requires that the personnel assigned to each ICT class "shall minimally include a special education teacher and a general education teacher," and that each class "shall not exceed 12 students" with disabilities.  *Id.* § 200.6(g)(1)–(2).  New York defines "integrated co-teaching" as "the provision of specially designed instruction and academic instruction provided to a group of students with disabilities and nondisabled students."  *Id.* § 200.6(g); *see also M.W.*, 725 F.3d at 144.  "The maximum number of students with disabilities receiving integrated co-teaching services in a class shall be determined in accordance with the students' individual needs [and the] number of students with disabilities in such classes [generally cannot] exceed 12 students."  *Id.* § 200.6(g)(1).  ICT services are designed to "enable students with disabilities to be educated with nondisabled students to the maximum extent appropriate, specially designed instruction and supplementary services may be provided in the regular class, including, as appropriate, providing related services, resource room programs and special class programs within the general

education classroom." *Id.* § 200.6(a)(1). "A school district may include integrated co-teaching services in its continuum of services." *Id.* § 200.6(g).

Whether R.G. could make progress in ICT is a purely educational issue within the expertise of the SRO. *See Cerra*, 427 F.3d at 195 ("Because administrative agencies have special expertise in making judgments concerning student progress, deference is particularly important when assessing an IEP's substantive adequacy."); *M.S.*, 231 F.3d at 105 ("An assessment of educational progress is a type of judgment for which the district court should defer to the SRO's educational experience, particularly where, as was the case here, the district court's decision was based solely on the record that was before the SRO."); *M.H.*, 685 F.3d at 240 ("[F]ederal courts reviewing administrative decisions must give due weight to these proceedings, mindful that the judiciary generally lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy." (internal quotation marks omitted)). It is also supported by the Parents' private test results, which recommended that R.G. remain in the ICT. (Ex. 46, at 4.) The SRO determined that the June 2012 CSE considered the August 2011 private testing report, which included the recommendation that R.G. stay in an ICT class, receive speech-language therapy, continue OT services, receive a number of accommodations, and have his anxiety and attention monitored. (SRO Decision 7.) The IEP developed for that school year shows that they included those services.

With respect to the Parents' argument that the IEP did not provide adequate speech language instruction, I find that the record indicates otherwise. The CSE did in fact offer speech language therapy for the 2012-2013 school year. Although the CSE did not initially include these services, and apparently only included them after the Parents provided the CSE with the private evaluators' recommendations, the CSE did ultimately incorporate the recommendations

into the IEP when it reconvened prior to the 2013 school year beginning.

The Parents make much of the fact that the CSE initially, during the June 2012 meeting, did not offer speech and language therapy, and only included it at the end of the summer, in August 2012. But the IDEA requires only that the District shall have the IEP in effect "[a]t the beginning of each school year." 20 U.S.C. § 1414(d)(2)(A); *see also* 34 C.F.R. § 300.323(a). It is not required to have finalized the IEP months prior to the beginning of the school year. Moreover, the IDEA specifically envisions parental involvement; therefore, the fact that CSE included the speech language programming only after the Parents suggested it and provided the private evaluations is not only immaterial, but the type of collaboration envisioned by the IDEA.

The Parents cite to *P.K. ex rel. S.K. v. N.Y.C. Dep't of Educ.*, 526 F. App'x 135 (2d Cir. 2013) (summary order), but in that case the Circuit concluded that an IEP that failed to include speech language therapy was inadequate because it was in "clear violation of then-applicable state regulations" requiring that autistic children receive a certain amount and type of speech language therapy, and where the SRO failed to point to evidence in support of the position that the student could progress without it. Here, in contrast, the IEP in question *did* offer speech language therapy in the form of small group speech and language therapy, one time weekly in the classroom, and one time weekly in the therapy room. (Ex. 50, at 5; Ex. 21, at 10.) The Parents' suggestion that less than 1:1 speech-language therapy is substantively inadequate, (Pls.' Br. 12), is undermined by their own private evaluation, which recommends that R.G. "remain in an integrated co-teaching class." (Ex. 46, at 4.)

Concluding that an ICT placement was insufficient for R.G., in the face of the District's conclusion that it was not, is "precisely the kind of educational policy decision a district court may not make absent objective evidence in the record suggesting that the SRO has reached an

erroneous conclusion." *Cerra*, 427 F.3d at 195–97; *see also M.H.*, 685 F.3d at 244 ("And the district court should afford more deference when its review is based entirely on the same evidence as that before the SRO than when the district court has before it additional evidence that was not considered by the state agency."). Therefore, the decisions of the SRO and IHO that R.G. was provided a FAPE for the 2012-2013 school year are affirmed.

### 3. The 2013-2014 School Year

The Parents argue that the District failed to meet its burden establishing the appropriateness of the 2013 IEP by reproducing essentially the same program offered the prior year. (Pls.' Br. 14.) "An IEP is not inappropriate, however, simply because it does not change significantly on an annual basis." *P.C. v. Rye City Sch. Dist.*, 232 F. Supp. 3d 394, 414 (S.D.N.Y. 2017) (internal quotation marks omitted). "To the extent there is some similarity between goals from year to year, such continuity makes sense. Modeling an IEP after the prior year's IEP, with appropriate changes, is a sensible practice that, as long as it is not done reflexively and without consideration of the student's individual circumstances and needs, does not signify that the student is likely to regress." *Id.* (quoting *J.C.S. ex rel. J.S. v. Blind Brook– Rye Union Free Sch. Dist.*, No. 12-CV-2896 (CS), 2013 WL 3975942, at *12 (S.D.N.Y. Aug. 5, 2013)).

The SRO found that the evidence available to the 2013 CSE, including updated cognitive and achievement testing and classroom observation by the District's psychologist, "did not suggest that the student's level of functioning and needs had changed significantly for the 2013-2014 school year, thus necessitating a placement other than a general education class placement with ICT and related services." (SRO Decision 7.) The SRO compared an April 2012 teacher report with a December 2012 Eagle Hill advisor report, as evidence that the student's abilities

and needs were "relatively unchanged, as both reports indicated that the student worked well with his peers, required review of directions and checks for understanding, was attentive and displayed positive work habits, and consistently completed homework assignments." (*Id.* at 7–8.) The December 2012 Report, available to the CSE, showed that R.G. had "consistently demonstrated low average general cognitive ability" over the past few years, and that his then-cognitive results "were similar to previous results and placed the student's functioning in the low average range." (*Id.* at 8.) This is sufficient evidence to justify an IEP that replicates the prior year with modest changes, namely the removal of direct and indirect consultant teacher services and addition of a special class (academic support lab) every other day. (Ex. 22.) Accordingly, the 2013 IEP is not inadequate on the basis that it resembles the 2012 IEP.

Because I conclude that the District did not deny R.G. a FAPE for the 2012-2013 and 2013-2014 school years, I need not determine whether the private placement was appropriate or consider the equities involved.

## V.    Conclusion

For the reasons stated, Plaintiffs' motion for summary judgment, (Doc. 21), is DENIED, Defendant's motion for summary judgment, (Doc. 19), is GRANTED, and the SRO's decision is AFFIRMED. The Clerk's Office is respectfully directed to enter judgment and close the case.

SO ORDERED.

Dated:  February 7, 2018
        New York, New York

Vernon S. Broderick
United States District Judge